# United States District Court

## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| EUROTEC VERTICAL FLIGHT SOLUTIONS, LLC. | § § § | |
| v. | § § | CASE NO. 3:15-CV-3454-S |
| SAFRAN HELICOPTER ENGINES S.A.S., SAFRAN HELICOPTER ENGINES USA, INC., and SAFRAN HELICOPTER ENGINES CANADA, INC. | § § § § § § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff EuroTec Vertical Flight Solutions, LLC ("Plaintiff") brings this action against Safran Helicopter Engines USA, Inc. ("SafranHE USA"), and against Safran Helicopter Engines S.A.S. ("SafranHE France") and Safran Helicopter Engines Canada, Inc. ("SafranHE Canada") (together, "International Defendants," and collectively with SafranHE USA, "Defendants"). In the Third Amended Complaint (the "Complaint")—which is the fourth complaint in this case—Plaintiff alleges violations of the Sherman Act, 15 U.S.C. §§ 1, 2, California Cartwright Act, CAL. BUS. & PROF. CODE § 16720 *et seq.*, Kansas Restraint of Trade Act, KAN. STAT. ANN. § 50-101 *et seq.*, § 35 of the Lanham Act, 15 U.S.C. § 1117, Texas Deceptive Trade Practices Consumer Protection Act ("DTPA"), TEX. BUS. & COM. CODE ANN. §§ 17.46, 17.50, as well as common law claims for breach of contract, wrongful detention, conversion, negligence, tortious interference, civil conspiracy, unfair competition, misrepresentation, and concealment.

Pending before the Court is SafranHE USA's and the International Defendants' Motions to Dismiss [ECF Nos. 103, 104]. For the foregoing reasons, the Court grants in part and denies in part the Motions.

# I. BACKGROUND

Pursuant to Special Order 3-318, this case was transferred from the docket of Judge Jane J. Boyle to the docket of this Court on March 8, 2018.

Plaintiff filed its original complaint on October 23, 2015, and amended the complaint to join new defendants on March 28, 2016. On June 1, 2016, Defendants filed a Motion to Compel Arbitration and a Motion to Dismiss, which the Court granted, staying the case pending arbitration. Following arbitration, the Court reopened the case on September 18, 2017, Plaintiff filed its Second Amended Complaint on October 9, 2017, and Defendants filed a new set of motions to dismiss. The Court held a hearing on the second set of motions to dismiss on November 18, 2018. The Court dismissed the Second Amended Complaint in its entirety but granted Plaintiff's motion for leave to amend. Although the Court expressed hope that affording Plaintiff an opportunity to replead would result in "some of the weaker of [the] 14 claims . . . [getting] taken out," ECF No. 92, at 65:21-23, Plaintiff's fourth attempt includes *thirty* causes of actions over the course of 130 pages, and includes many of the same weaker claims as its prior attempt. *See* Third Am. Compl. Defendants filed a third set of motions to dismiss on January 25, 2019, which is the subject of this Memorandum Opinion and Order.

## A. *Parties*

Plaintiff is a Kansas limited liability company that owns helicopters and helicopter engines, is a certified repair station, and is in the business of buying, selling, and leasing helicopters, engines, and engine parts. *See* Third Am. Compl. ¶¶ 1-4. Plaintiff also provides consumers with various services, including engine maintenance, repair, and overhaul services ("MRO Services"). *Id.* ¶ 5. Defendants are manufacturers, marketers, sellers, and lessors of helicopter engines and of modules, components, parts, and accessories for those engines. *Id.* ¶¶ 9, 12-15, 18. Defendants also market and provide MRO Services for their engines. *Id.*

With the exception of SafranHE USA, which is a Delaware corporation with its principal place of business in Dallas County, Texas, the Defendants are foreign companies. *Id.* ¶ 11. SafranHE France, formerly Turbomeca, S.A. and Turbomeca S.A.S., is a French company and domiciliary. *Id.* ¶ 7. SafranHE Canada is a Canadian corporation and domiciliary. *Id.* ¶ 17. Plaintiff contends, however, that there is a significant unity of interest in ownership and control between the three Defendants, such that they are alter egos of one another. *Id.* ¶ 20. Plaintiff alleges that either SafranHE France is able to exert a great degree of control over the other Defendants, that Defendants are agents of one another, or that they acted in concert, pursuant to agreements, or as a joint venture, such that they should be considered a single business enterprise. *Id.* ¶¶ 21-24.

## B. *Market Allegations*

Civilian and military helicopters are designed and manufactured by Airbus Helicopters ("Airbus"), Bell Helicopter, Leonardo Helicopters, Sikorsky Aircraft Corporation and other companies. *Id.* ¶ 70. According to Plaintiff, approximately 45% of all civil and parapublic helicopters worldwide are manufactured by Airbus. *Id.* ¶ 73. Airbus does not manufacture the engines used in its helicopters, instead relying on companies in the business of designing and manufacturing engines. *Id.* ¶ 75. Defendants are the largest manufacturers dedicated solely to the manufacturing of helicopter engines, and compete with "General Electric, Rolls-Royce, and Pratt & Whitney Canada." *Id.*

Plaintiff alleges that there is one geographic market and two relevant product markets.[1] *Id.* ¶ 244. The geographic is allegedly the United States, while the product markets are: (1) market for Defendants' engines and parts; and (2) market for MRO Services for Defendants' engines.

---

[1] These allegations are relevant to Plaintiff's antitrust claims. As explained in more detail below, most of Plaintiff's claims require it to plead a relevant market, which is composed of a geographic market—the geographic area where

### (1)    *Geographic Market*

Plaintiff asserts that the relevant geographic market is the United States. *Id.* ¶ 244. Nonetheless, Plaintiff contends that (1) Defendants deal in the United States and Canada; (2) Defendants' customers are located in the United States and Canada, and turn to sellers in both countries for engines and parts; and (3) sellers of Safran engines and parts, as well as providers of MRO Services, view as competition sellers and service providers in both the United States and Canada. *Id.* ¶¶ 245-49.

### (2)    *Market for Engines and Parts*

The first relevant product market is allegedly the market for Defendants' engines and parts. *Id.* ¶ 252. Plaintiff states that SafranHE France is the largest supplier of helicopter engines to Airbus, manufacturing all of the engines for the ten Airbus models sold in the United States. *Id.* ¶ 79. According to the Complaint, there are approximately 1,632 helicopters in existence with Defendants' engines. *Id.* ¶ 74. Airbus's other supplier, Pratt & Whitney Canada, is the exclusive supplier for only one Airbus model. *Id.* Plaintiff alleges that a consumer would not find it cost-effective either to replace an entire engine or to seek FAA recertification of a helicopter for use with another engine to avoid paying Defendants' higher prices. *Id.* ¶¶ 258-60.

Moreover, engines and parts manufactured by Defendants are allegedly neither interchangeable nor compatible with engines and parts manufactured by other manufacturers. *Id.* ¶¶ 253-55. Thus, a part manufactured by General Electric, for example, cannot be used in Defendants' engines.[2] *Id.* ¶ 257. According to Plaintiffs, the demand for Defendants' engines and parts is thus independent of the demand for other manufacturers' engines and parts. *Id.* ¶ 256.

---

Defendants compete—and a product market—a market of reasonably interchangeable goods. *See infra* § III.C.1.a.iii.a.

[2] Plaintiff's allegations on this point are inconsistent. Plaintiff later alleges that Defendants sought to "prevent competition from manufacturers of new PMA Parts (*substitute parts otherwise manufactured by companies not*

Plaintiff has not alleged, however, the total number of Airbus helicopters or other facts from which the Court could deduce Defendants' market share with Airbus. Similarly, Plaintiff alleged that there are more than 2,300 helicopters with Defendants' engines, *id.* ¶ 81, but has not alleged Defendants' market share of all engines or parts in the United States or worldwide, aside from the conclusory statement that Defendants have "a market share of over 50 percent." *Id.* ¶ 668.

Plaintiff further claims that while some manufacturers use distributors to sell engine parts, some sell refurbished or used parts, and others sell new replacement parts, *id.* ¶¶ 83-86, Defendants are the sole distributors of their own parts. *Id.* ¶¶ 670-71. Plaintiff thus contends that Defendants have monopoly power in the market for their own parts. *Id.* ¶¶ 668-73.

### (3)     *Market for MRO Services*

Plaintiff alleges that there is a market for MRO Services. *Id.* ¶ 93. Plaintiff asserts that "[s]ervices provided to helicopter manufacturers are not within [this] relevant [product] market." *Id.* ¶ 262. Some manufacturers provide MRO Services themselves, while others authorize independent service providers to perform MRO Services. *Id.* ¶¶ 93-94. Purportedly, there is no cross-elasticity[3] between the MRO Services for Defendants' engines and MRO Services for other manufacturers' engines. *Id.* ¶ 263.

Defendants provide MRO Services and have also authorized other companies to perform MRO Services subject to limitations—for example, one company is authorized to perform only "Level 4" engine repair and overhaul on a limited number of models. *Id.* ¶¶ 93-100. Defendants

---

*affiliated with defendants*, under an FAA program known as Part Manufacturing Authorization)." *Id.* ¶ 689 (emphasis added). Thus, there appears to be some substitutability of parts.

[3] "Cross-elasticity" refers to the responsiveness of the demand for one product to a change in price of another product. This concept is used to define a product market in antitrust claims. *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956). For example, if "a slight decrease in the price of cellophane causes a considerable number of customers of other flexible wrappings to switch to cellophane, it would be an indication that a high cross-elasticity of demand exists between [flexible wrappings and cellophane]; that the products compete in the same market." *Id.* at 400. If the products have low cross-elasticity of demand—i.e., a change in the price of one product does not affect demand for another product, then the products are likely competing in different markets.

allegedly choose whom to authorize to perform repair services, restrain access to technical information, and withhold the supply of parts necessary to perform certain repairs. *Id.* ¶ 264. Plaintiff also states, with no factual support, that Defendants have a market share of at least 50% in the MRO Services for their engines and parts, mirroring its conclusory allegations regarding Defendants' share of the engines and parts market. *Compare id.* ¶ 674, *with id.* ¶ 668. Plaintiff thus contends that Defendants have monopoly power in the MRO Services for their engines and parts. *Id.* ¶¶ 674-83.

## C. *The Dispute over Parts*

For more than a decade, Plaintiff would request MRO Services or engine parts from SafranHE USA or SafranHE Canada, and these Defendants would honor Plaintiff's requests. *Id.* ¶¶ 101-03. Moreover, Plaintiff allegedly had a business arrangement in which SafranHE USA provided it with access to technical information, allowing Plaintiff to perform MRO Services on Defendants' engines and parts. *Id.* ¶ 104.

According to the Complaint, Plaintiff would routinely send parts to SafranHE USA or SafranHE Canada, requesting a quote of an estimated cost for the inspection and service. *Id.* ¶ 109. SafranHE USA and SafranHE Canada would review the documentation, disassemble the parts, and develop a quote for Plaintiff's review. *Id.* ¶¶ 110-11. The parties would then negotiate the nature of the service and any remaining or unused parts would be promptly returned to Plaintiff certified as airworthy or marked "as is."[4] *Id.* ¶¶ 112-18. Between 2001 and 2010, SafranHE USA and SafranHE Canada allowed their customers to request "scrap parts" to be returned in their "as is" condition without SafranHE USA or SafranHE Canada certifying the parts as airworthy,

---

[4] The Complaint does not explain what "as is" certification entails.

repairable, or unserviceable. *Id.* ¶¶ 119-20. SafranHE USA and SafranHE Canada would also offer to compensate Plaintiff if its part was lost in their course of dealing. *Id.* ¶¶ 122-23.

SafranHE USA and SafranHE Canada did not, however, return to Plaintiff all of the parts it sent them for MRO Services. *Id.* ¶¶ 125-28 & Exs. A-C. They allegedly lost some of the parts after assigning them work order numbers. *Id.* ¶¶ 127-31. SafranHE USA and SafranHE Canada marked some other parts as "scrap" but sent them to SafranHE France to be made serviceable again. *Id.* ¶¶ 136-38. According to Plaintiff, SafranHE USA and SafranHE Canada agreed to compensate Plaintiff for some of these parts, and the parties continued discussing compensation for the remaining lost parts. *Id.* ¶¶ 132-35, 139-47.

Plaintiff further alleges that SafranHE USA and SafranHE Canada instituted a policy of "defacing" parts by scratching through the part or serial number, engraving a triangle into the part, or otherwise physically damaging the part (the "Defacing Policy"). *Id.* ¶ 148. A part that has been defaced allegedly cannot be repaired or serviced pursuant to Federal Aviation Administration ("FAA") regulations. *Id.* ¶ 149. Even if a part was "scrap," it was still valuable to Plaintiff, Defendants, and their customers, because it could become approved for use in engines if, among other things, the manufacturer increased the usage or service life, or the manufacturer or the FAA approved a new repair method. *Id.* ¶¶ 150-51. Moreover, Plaintiff alleges that the defacing of its parts was contrary to the parties' course of dealing, FAA regulations, and SafranHE USA's and SafranHE Canada's terms and conditions. *Id.* ¶¶ 152-58. On prior occasions, SafranHE USA and SafranHE Canada allegedly offered to compensate Plaintiff for the defaced parts. *Id.* ¶¶ 156-57.

In late 2008 or early 2009, however, SafranHE USA began holding Plaintiff's unserviceable parts pending policy review and gave Plaintiff an option of either allowing SafranHE USA to hold Plaintiff's parts, or allowing it to return the parts defaced. *Id.* ¶¶ 159-60. Plaintiff

claims that SafranHE USA did not inform it of any decision to change the original course of dealing, but also alleges that SafranHE USA began including language in their quotes authorizing SafranHE USA to deface the parts. *Id.* ¶¶ 162-63. SafranHE USA emailed Plaintiff about the new Defacing Policy on April 25, 2011, and sought to impose the policy on any part already stored. *Id.* ¶¶ 164, 290-92. Subsequent attempts to resolve the dispute were unfruitful, with SafranHE France requiring SafranHE USA to implement the policy, and Plaintiff objecting to it and refusing to allow its parts to be defaced. *Id.* ¶¶ 165-69, 171-76. Plaintiff claims that by this time, SafranHE Canada had already defaced some of Plaintiff's parts. *Id.* ¶ 170.

After Plaintiff filed the present action, Defendants announced that they would not deface parts before returning "unsalvageable parts" to customers, so long as the customers would sign an indemnification agreement holding Defendants harmless and commit not to equip Defendants' engines with unserviceable parts. *Id.* ¶¶ 176-77. Defendants' authorized service providers adopted similar requirements for returning unserviceable parts. *Id.* ¶¶ 178-82.

In addition to its allegations regarding the Defacing Policy, Plaintiff complains about Defendants' policy regarding engines and parts involved in an accident (the "Accident Policy") and SafranHE USA and SafranHE Canada's refusal to certify or return parts serviced by Plaintiff. *Id.* ¶ 185. Pursuant to the Accident Policy, Defendants allegedly restricted the scope of available repair services unless certain conditions are met, *id.* ¶ 184, and SafranHE USA refused to return Plaintiff's parts certified "as is." *Id.* ¶¶ 190, 193, 290-92. Plaintiff, however, alleges that it never agreed to be bound by this policy, that the policy is contrary to the parties' course of dealing, and that the policy is not required by FAA regulations. *Id.* ¶¶ 186-88, 191-92. Additionally, Defendants allegedly refused to repair or certify parts that Plaintiff serviced because Plaintiff was

not "approved" to perform Level 3 and 4 services. *Id.* ¶¶ 194-95. As a result, Plaintiff contends that its parts are not as marketable or profitable. *Id.* ¶ 198.

### D. *The Dispute over Plaintiff's Role as a Service Provider*

In 2007 and 2008, Plaintiff and SafranHE USA discussed allowing Plaintiff to be an authorized provider of "Level 3" MRO Services. *Id.* ¶ 383. To meet SafranHE USA's requirements, Plaintiff trained personnel and made other investments. *Id.* ¶ 385. Nonetheless, SafranHE France, through SafranHE USA, denied Plaintiff's request to become an authorized service provider in 2008 and again in 2009. *Id.* ¶¶ 386-88.

In 2010, however, SafranHE USA offered Plaintiff a Maintenance Authorization Agreement ("MAA"), which allowed Plaintiff to perform Level 3 maintenance. *Id.* ¶ 389. Plaintiff maintains that it could not negotiate any change to this agreement because of its significant investment, and so agreed. *Id.* The MAA obligated Defendants to provide Plaintiff with various documentation including technical information. *Id.* ¶¶ 389-92. Either party could terminate the MAA for any reason, provided it gave ninety days' written notice. *Id.* ¶ 393. A breaching party had thirty days to cure a breach of the MAA. *Id.* ¶ 394.

In May 2012, SafranHE USA and SafranHE France terminated Plaintiff's access to certain technical information. *Id.* ¶¶ 395-402. Moreover, SafranHE USA allegedly breached the MAA by refusing to train Plaintiff's technicians. *Id.* ¶ 411. Mike Gaines[5] admitted to SafranHE USA's president that the MAA was still in effect, but suggested that it be terminated. *Id.* ¶ 403. According to Plaintiff, SafranHE USA attempted to formally terminate the MAA in August 2014, when it sent Plaintiff a notice of termination due to Plaintiff's breach of the MAA. *Id.* ¶ 404. Plaintiff alleges, however, that the termination letter was not effective to terminate the agreement because

---

[5] The Complaint does not state who Gaines is.

9

Plaintiff did not receive notice that it was in breach of the MAA.[6] *Id.* ¶ 405. Plaintiff further alleges that it had a right to continued access to Defendants' technical information because of its substantial investment. *Id.* ¶ 406.

## E. *Alleged Anticompetitive Conduct*

According to Plaintiff, Defendants engaged in various anticompetitive conduct. Plaintiff's allegations can be grouped into the following categories: (1) MAAs; (2) the Defacing Policy and the Accident Policy; (3) the Fleet Service Agreements; (4) alleged price fixing; (5) alleged group boycott; (6) alleged exclusive supply agreements; (7) other restraints on MRO Services; and (8) monopolization allegations.

### (1) *Maintenance Authorization Agreements*

Plaintiff alleges that the MAAs SafranHE USA signed with Plaintiff and Helicopter Services of Nevada LLC ("HSN") restrain competition in the engines and parts market and the MRO Services market. *Id.* ¶¶ 421-58. The MAAs purportedly insulate Defendants from rivals offering less expensive engine parts and services. *Id.* ¶¶ 433-34, 451-52. Plaintiff alleges to have been harmed by its own MAA and by SafranHE USA's MAA with HSN. *Id.* ¶¶ 438, 457.

### (2) *Defacing and Accident Policies*

Plaintiff also complains that Defendants conspired together and with other MRO Service Providers to implement the "Defacing Policy" and the Accident Policy. *Id.* ¶¶ 270-76. SafranHE France specifically required authorized service providers to abide by the Defacing Policy, and Defendants required service providers to observe the Accident Policy through a series of service letters. *Id.* ¶¶ 275-77. For example, SafranHE USA and SafranHE France purportedly entered

---

[6] At an unspecified time, Defendants did notify Plaintiff that Plaintiff was breaching the MAA by failing to maintain trained technicians, failing to comply with audit requirements, and failing to maintain insurance. *Id.* ¶ 408. Plaintiff disputes that it breached any provision. *Id.* ¶¶ 408-10, 412.

into contracts with service providers Heli-One Colorado, Inc., Heli-One Canada, Inc., and Heli-One American Support LLC (collectively "Heli-One"), Advanced Helicopter Services of Woodland, CA ("Advanced"), and Vector Aerospace Helicopter Services, Inc. ("Vector"), requiring the service providers to observe Defendants' policies. *Id.* ¶ 278. Thus, Heli-One, Advanced, and Vector have Defacing Policies. *Id.* ¶¶ 279-83. Additionally, Defendants and other service providers return unserviceable parts only after a customer agrees to indemnify and hold them harmless, and agrees not to use unserviceable parts in Defendants' engines or other helicopters. *Id.* ¶¶ 285-87. Similarly, Plaintiff claims that SafranHE USA and SafranHE Canada contracted with Heli-One, Vector, and Advanced to enforce the Accident Policy, meaning that Plaintiff has no available provider to make parts involved in an accident serviceable again. *Id.* ¶ 288.

According to Plaintiff, the alleged contracts adopting, and the purported conspiracy to adopt, the Defacing Policy and Accident Policy suppresses intrabrand competition in both the engine and parts market and the MRO Services market. *Id.* ¶ 294. The contracts and conspiracy allegedly allow Defendants to entrench their position in the markets for their own parts and services. *Id.* ¶ 299. In other words, the alleged conduct is meant to prevent the emergence of a market for second-hand parts and for unauthorized repair centers. *Id.* ¶¶ 300-02.

### (3) *Fleet Parts and Service Agreements*

SafranHE USA and SafranHE Canada allegedly entered into Fleet Service Agreements or Fleet Parts Agreements with owners of helicopter fleets. Under a Fleet Service Agreement, a fleet owner is granted access to technical information solely for the purpose of performing services on Defendants' parts that the owners owned, leased, or operated. *Id.* ¶ 461. SafranHE USA purportedly has such agreements with HSN and Papillon Airways, Inc. ("Papillon"). *Id.* ¶¶ 452-65. A Fleet Parts Agreement, in turn, provides that SafranHE USA's or SafranHE

11

Canada's certification of any part they service for a fleet owner is nontransferable. *Id.* ¶ 479. According to Plaintiff, these agreements suppress intrabrand competition for Defendants' parts and have harmed Plaintiff. *Id.* ¶¶ 466, 471-75, 484, 489-94.

### (4) *Price Fixing*

Plaintiff claims that Defendants conspired to fix the price of MRO Services. *Id.* ¶ 497-502. Specifically, SafranHE USA allegedly entered into agreements with Heli-One, Advanced, Arrow Aviation Company LLC ("Arrow"), and Precision Aviation Services ("Precision"), whereby these service providers agreed not to "undercut" SafranHE USA's MRO Services pricing. *Id.* ¶¶ 497-500. Advanced, in turn, entered into similar agreements with Rorotech Services, Inc. ("Rorotech") and Helicopter Specialties, Inc. ("Helicopter Specialties"). *Id.* ¶ 501. Plaintiff contends that this scheme harms intrabrand competition and has caused Plaintiff to pay higher prices for MRO Services. *Id.* ¶¶ 508-12.

### (5) *Group Boycott*

According to the Complaint, Defendants were also concerned with whether Plaintiff was a true end user of its parts, or whether it was secretly reselling them. *Id.* ¶¶ 555-56. Defendants asked Plaintiff about the real end user and were allegedly not convinced by the information Plaintiff provided. *Id.* ¶¶ 557-59. Beginning in February 2015, SafranHE USA allegedly instructed its network of authorized service providers not to do business with Plaintiff. *Id.* ¶¶ 561-65. This alleged group boycott was aimed at eliminating the market for second-hand parts, and harmed competition and Plaintiff. *Id.* ¶¶ 560-77.

### (6) *Exclusive Supply Agreements*

Plaintiff claims that Defendants entered into exclusive supply agreements with Zodiac Aerospace ("Zodiac") and other vendors, such that the vendors agreed to supply engine parts and accessories only to Defendants. *Id.* ¶¶ 615-18. Defendants allegedly entered into such agreements

12

to ensure control over pricing, quality, and reliability. *Id.* ¶¶ 617, 624. Plaintiff asserts that customers complain that these supply agreements increase time and cost. *Id.* ¶¶ 618-22. Plaintiff argues that this vertical restraint harmed Plaintiff, increased costs for consumers, and was unreasonable, unjustified, and anticompetitive. *Id.* ¶¶ 626-40.

### (7) *Other Restraints on MRO Services*

Plaintiff alleges that Defendants imposed other unreasonable restraints on MRO Services. Defendants allegedly: (1) required the use of Defendants' parts and prohibited the installation of a customer's own parts or parts from other repair stations not authorized by Defendants; (2) conditioned the sale of some services on the purchase of modifications a customer has not requested; and (3) conditioned the return of parts used in a level of service a customer is not allowed to perform on the return of the part to an authorized service center. *Id.* ¶¶ 644-53. These restraints harmed Plaintiff and are allegedly unreasonable, unjustified, and anticompetitive. *Id.* ¶¶ 653-65.

### (8) *Monopolization Allegations*

Finally, Plaintiff alleges that Defendants monopolized or attempted to monopolize the markets for Defendants' engines and parts and MRO Services by: (1) preventing competition from manufacturers of substitute parts by directing repair centers to throw away any substitute part found in Defendants' engines and by informing its customers of this fact; and (2) preventing unauthorized repair centers from accessing Defendants' technical information. *Id.* ¶¶ 689-92, 701. By taking these actions, Defendants were purportedly able to obtain or maintain monopoly power in the relevant markets. *Id.* ¶¶ 693-96, 700.

### F.  *Summary of the Claims*

Plaintiff alleges thirty separate state and federal law claims against Defendants. For the sake of clarity, the Court will group these claims into four categories: (1) breach of contract claims; (2) antitrust claims; (3) tort claims; and (4) deceptive practices claims.

### (1)  *Breach of Contract Claims*

In Count I, Plaintiff alleges that SafranHE USA and SafranHE Canada breached an express or implied contract by losing, misappropriating, defacing, withholding, or refusing to certify Plaintiff's parts. In Count VIII, Plaintiff alleges that SafranHE USA and SafranHE France breached the MAA.

### (2)  *Antitrust Claims*

In Counts V and VI, brought under Sherman Act § 1 and California's Cartwright Act, respectively, Plaintiff alleges that Defendants are liable for conspiring and entering into the Defacing Policy and Accident Policy together and with other service providers. In Count VII, Plaintiff alleges that Defendants imposed the Defacing Policy on its unwilling customers in violation of Sherman Act § 1. In Counts IX and X, Plaintiff alleges that the MAAs Defendants signed with Plaintiff and HSN unreasonably restrain trade in violation of Sherman Act § 1. In Counts XI and XII, Plaintiff claims that the Fleet Service Agreements and the Fleet Parts Agreements violate Sherman Act § 1. In Counts XIII and XIV, Plaintiff seeks to recover under Sherman Act § 1 and the Cartwright Act, respectively, for the alleged price fixing. Counts XVII and XVIII purport to state claims under Sherman Act § 1 and the Cartwright Act, respectively, for the alleged group boycott. In Count XX, Plaintiff claims that the alleged exclusive supply agreements violate Sherman Act § 1. Count XXI states a Sherman Act § 1 claim premised on the various other restraints Defendants impose on the MRO Services. In Counts XXII and XXIII Plaintiff seeks damages and an injunction for Defendants' alleged monopolization or attempted

14

monopolization of the relevant markets under Sherman Act § 2. Finally, Plaintiff appears to recast all of the alleged claims under the Kansas Restraint of Trade Act in Counts XXIV and XXV.

### (3) *Tort Claims*

In Count II, Plaintiff alleges that Defendants are all liable as bailees for wrongful detention, conversion, or negligence of Plaintiff's parts. Plaintiff alleges in Counts III and IV that SafranHE France directed or induced SafranHE USA and SafranHE Canada to breach their contracts with Plaintiff, and so is liable for tortious interference with contracts or existing business relationships. In Counts XV and XVI, Plaintiff alleges that SafranHE USA is liable for tortious interference because it instructed Advanced to breach its contracts with Plaintiff, to not do business with Plaintiff, or to refuse to extend Plaintiff credit, and otherwise restricted that business relationship. In Count XIX, Plaintiff claims that SafranHE USA tortiously interfered with its business relationship with Zodiac by instructing it not to deal with Plaintiff. Count XXVI recasts the aforementioned conduct as a claim for civil conspiracy.

### (4) *Deceptive Practices Claims*

Plaintiff alleges two sets of claims arising out of SafranHE USA's allegedly deceptive conduct. First, according to Plaintiff, SafranHE USA falsely stated in service bulletins and marketing that all manuals and technical documentation were proprietary and not available to service providers not approved by SafranHE USA. *Id.* ¶¶ 733-36. This statement was allegedly false because the FAA recently suggested that a manufacturer may not deny access to such technical information. *Id.* ¶¶ 737, 745, 758. Plaintiff alleges in Counts XXVII and XXVIII that these statements are actionable under Lanham Act § 35 or as common law unfair competition through deceptive marketing. *Id.* ¶¶ 732-63.

Second, Plaintiff complains of a certain helicopter engine module ("Module 3"). *Id.* ¶ 765. SafranHE USA allegedly serviced and overhauled this module in October 2009. *Id.* ¶ 766. At the

time of the service, SafranHE USA allegedly knew that its current service procedure caused problems with the module's blades, and had already developed a new procedure to address this problem. *Id.* ¶¶ 773-76. Nonetheless, SafranHE USA allegedly serviced the module pursuant to the old procedure, concealed the issue from the owner of the module, and intentionally or negligently misrepresented to the owner that the module would operate for 800 hours. *Id.* ¶¶ 769, 778-79. After Plaintiff purchased the module and resold it to "Heli Afrique," it failed after only 96.5 hours of service. *Id.* ¶¶ 770, 784. SafranHE USA refused to repair it, informing Plaintiff that there was no justifiable reason for extending the warranty period. *Id.* ¶¶ 784-86, 789. Based on the foregoing allegations, Plaintiff alleges that SafranHE USA's statements regarding the availability of the new service procedure and the lack of justifiable reason for extending the warranty were false or misleading. *Id.* ¶¶ 789, 797, 800-12. Plaintiff seeks to hold SafranHE USA liable for these alleged false statements in Count XXIX, under the DTPA, and in Count XXX, under theories of misrepresentation or concealment.

### G.  *Pending Motions*

In their Motions, Defendants raise multiple reasons for the Court to dismiss twenty-seven Counts in whole or in part. SafranHE USA argues that Plaintiff did not sufficiently plead claims under the Sherman Act, Cartwright Act, Kansas Restraint of Trade Act, Lanham Act, or for unfair competition, tortious interference, and civil conspiracy. *See* Br. of SafranHE USA (hereinafter, "Br.") 3-17, 19-25. SafranHE USA also argues that some of Plaintiff's antitrust claims are barred by the applicable statutes of limitations. *See id.* 17-19. The International Defendants join SafranHE USA's arguments, but also ask the Court to dismiss the alter ego allegations, to hold that the Court lacks subject matter jurisdiction over the antitrust claims, and to hold that SafranHE France is not subject to personal jurisdiction over any claims asserted against it. *See* Int'l Defs.' Br. 4-25.

## II.     LEGAL STANDARDS

### A.     *Subject Matter Jurisdiction*

Under the Constitution, a federal court may decide only actual cases or controversies. U.S. CONST. art. III, § 2. A court properly dismisses a case where it lacks the constitutional power to decide it. *See Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). Dismissal for lack of subject matter jurisdiction is warranted when "it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Gilbert v. Donahoe*, 751 F.3d 303, 307 (5th Cir. 2014) (quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)). "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming*, 281 F.3d at 161 (citing *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)).

### B.     *Personal Jurisdiction*

Federal Rule of Civil Procedure 12(b)(2) allows defendants to move to dismiss claims for lack of personal jurisdiction. The plaintiff bears the burden of making a prima facie showing that a court has personal jurisdiction over a defendant. *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 431 (5th Cir. 2014). In considering a motion to dismiss pursuant to Rule 12(b)(2), the court must accept the plaintiff's "uncontroverted allegations, and resolve in its favor all conflicts." *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000). The court may consider "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985).

Because Texas's long-arm statute extends to the limits of federal due process, this Court has personal jurisdiction over a nonresident defendant so long as the assertion of jurisdiction

comports with the Due Process Clause of the United States Constitution. *See Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018). "Due process requires that the defendant have 'minimum contacts' with the forum state . . . and that exercising jurisdiction is consistent with 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008)).

Personal jurisdiction can be general or specific. *See Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001). General jurisdiction allows a court to hear any claim against a nonresident defendant, and it exists when that defendant's "affiliations with [Texas] are so 'continuous and systematic' as to render them essentially at home in [Texas]." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). "Establishing general jurisdiction is 'difficult' and requires 'extensive contacts between a defendant and a forum.'" *Sangha*, 882 F.3d at 101-02 (quoting *Johnston*, 523 F.3d at 609).

In evaluating specific jurisdiction, courts consider:

(1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Carmona v. Leo Ship Mgmt., Inc.*, 924 F.3d 190, 193 (5th Cir. 2019) (quoting *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006)). "In order for a . . . court to exercise specific jurisdiction, 'the suit' must 'aris[e] out of or relat[e] to the defendant's contacts with the *forum*.'" *Bristol-Myers Squibb Co. v. Super. Ct.*, 137 S. Ct. 1773, 1780 (2017) (first alteration added) (quoting *Daimler AG*, 571 U.S. at 127). "In other words, there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Id.* (alteration in original) (quoting *Goodyear*, 564 U.S. at 919).

The minimum contacts analysis is fact intensive, and the touchstone is "whether the defendant's conduct shows that it 'reasonably anticipates being hauled into court'" in the forum state. *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009) (quoting *Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 470 (5th Cir. 2006)). Once the plaintiff establishes minimum contacts, the burden shifts to the defendant to show that the exercise of jurisdiction is "unfair and unreasonable." *Sangha*, 882 F.3d at 102. In determining whether the defendant has carried this burden, courts balance five factors: (1) the burden on the nonresident defendant of having to defend itself in the forum; (2) the interests of the forum state in the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the shared interests of the states in furthering fundamental social policies. *Id.*

## C. *Failure to State a Claim*

To defeat a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008). To meet this "facial plausibility" standard, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility does not require probability, but a plaintiff must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.* The court must accept well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins.*, 509 F.3d 673, 675 (5th Cir. 2007). However, the court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (internal citations omitted).

The ultimate question is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002). At the motion to dismiss stage, the court does not evaluate the plaintiff's likelihood of success. It only determines whether the plaintiff has stated a claim upon which relief can be granted. *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977).

## III.     ANALYSIS

### A.     *Alter Ego*

The Complaint states that "[D]efendants are the alter-egos of one another." Third Am. Compl. ¶¶ 20-24. A sufficiently pleaded alter ego theory could affect the Court's analysis of the challenges to its subject matter jurisdiction or its personal jurisdiction over the International Defendants, and so the Court will address this issue first. *See, e.g., Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002) ("[A] court [may] exercise personal jurisdiction over . . . a corporation that would not ordinarily be subject to personal jurisdiction in that court when the . . . corporation is an alter ego . . . of a corporation that would be subject to personal jurisdiction in that court." (collecting cases)).

The Court resolves alter ego issues by considering "the totality of the circumstances," in light of the following list of non-exhaustive factors:

> (1) the parent and the subsidiary have common stock ownership; (2) the parent and the subsidiary have common directors or officers; (3) the parent and the subsidiary have common business departments; (4) the parent and the subsidiary file consolidated financial statements and tax returns; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; (7) the

subsidiary operates with grossly inadequate capital; (8) the parent pays the salaries and other expenses of the subsidiary; (9) the subsidiary receives no business except that given to it by the parent; (10) the parent uses the [subsidiary's] property as its own; (11) the daily operations of the two corporations are not kept separate; and (12) the subsidiary does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings.

*Gundle Lining Constr. Corp. v. Adams Cty. Asphalt, Inc.*, 85 F.3d 201, 208-09 (5th Cir. 1996) (quoting *United States v. Jon-T Chems., Inc.*, 768 F.2d 686, 691-92, 694 (5th Cir. 1985)). Texas state courts consider similar factors. *See, e.g., Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 229 (Tex. 1990). Generally, the Court will only find corporations to be alter egos of one another "when there is such unity between [the corporations] that the separateness of the corporation[s] has ceased and holding only [one] corporation liable would result in injustice." *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 302 (5th Cir. 2007) (quoting *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986)). The Court can dismiss an alter ego claim where the complaint lacks sufficient factual allegations to state the claim. *See, e.g., In re Parkcentral Glob. Litig.*, Civ. A. No. 3:09-CV-0765-M, 2010 WL 3119403, at *10-11 (N.D. Tex. Aug. 5, 2010) (dismissing a claim to pierce the corporate veil); *Rolls-Royce Corp. v. Heros, Inc.*, 576 F. Supp. 2d 765, 789 (N.D. Tex. 2008) (dismissing alter ego claim where complaint was devoid of factual assertions in support of it).

The Court finds that the Complaint lacks sufficient factual allegations to suggest that the Defendants are alter egos of one another. First, the Court does not credit Plaintiff's conclusory allegation that "there has existed . . . a unity of interest in ownership and control between [Defendants]." Third Am. Compl. ¶ 20. This leaves only one allegation to support the alter ego theory: that SafranHE France exercised substantial decision-making power over the other Defendants. *See id.* ¶¶ 21-24. After foraging the Complaint for examples of such control, the Court found the following allegations: (1) SafranHE France decided who would be an authorized service provider, *see id.* ¶¶ 52-53; (2) SafranHE France imposed various policies upon the other

21

Defendants, *see id.* ¶¶ 55, 149, 186; and (3) the other Defendants shipped parts to SafranHE France for repairs, *see id.* ¶ 138. Even accepting these allegations as true, the relationship between Defendants is a far cry from "such unity between [the corporations] that the separateness of the corporation[s] has ceased." *Res. Dev. Int'l*, 487 F.3d at 302. Thus, the Court finds that Plaintiff did not plead sufficient facts to show that Defendants are alter egos of one another. Accordingly, the Court grants the Motions as to the alter ego allegations and will treat Defendants separately for jurisdictional purposes.

### B. *Jurisdiction*

Having determined that the Complaint does not state a viable alter ego claim, the Court now turns to whether the Complaint alleges sufficient facts to establish the Court's subject matter jurisdiction and personal jurisdiction. Here, Defendants raise four arguments: (1) that the Foreign Trade Antitrust Improvements Act ("FTAIA") bars the federal antitrust claims against them; (2) that the FTAIA also bars the state antitrust claims; (3) that Plaintiff lacks standing to bring a Cartwright Act claim; and (4) that the Court lacks personal jurisdiction over SafranHE France. For the reasons stated below, the Court finds that it lacks subject matter jurisdiction over Counts IX and X as to the International Defendants, lacks subject matter jurisdiction over Count XI as to SafranHE Canada, and lacks personal jurisdiction over SafranHE France as to Count II. The Court otherwise denies the Motions to dismiss on these bases.

### (1) *FTAIA and Sherman Act Claims*

The FTAIA limits the application of the federal antitrust laws when non-import foreign commerce is involved. *See* 15 U.S.C. § 6a; *Den Norske Stats Oljieselskap As v. HeereMac Vof*, 241 F.3d 420, 421 (5th Cir. 2001). The FTAIA specifically excludes claims under the Sherman Act for non-import activity unless (1) the conduct has a direct, substantial, and reasonably foreseeable effect on United States imports, domestic commerce, or United States exports, and

(2) such effect gives rise to a claim under the Sherman Act. *See* 15 U.S.C. § 6a(1); *Hartford Fire Ins. v. California*, 509 U.S. 764, 796 n.23 (1993). The FTAIA also "precludes subject matter over claims by foreign plaintiffs against defendants where the situs of the injury is overseas and that injury arises from effects in a non-domestic market." *Den Norske*, 241 F.3d at 428.

In this case, the Court finds that the FTAIA does not bar the antitrust claims pleaded in Counts V, VII, XI (against SafranHE France only), XII, XIII, XVII, XXI, and XXII. For these Counts, Plaintiff alleged that the International Defendants' conduct harmed domestic commerce and Plaintiff, a domestic corporation. *See, e.g.*, Third Am. Compl. ¶¶ 298, 374, 702. Moreover, Plaintiff alleged that the International Defendants either directly participated in the U.S. markets, *see, e.g., id.* ¶¶ 245, 285, 358, 672, 701, entered into alleged anticompetitive agreements with U.S. companies, *see, e.g., id.* ¶¶ 273, 278, 280, 463, 479, 503, or allegedly conspired to restrain U.S. commerce, *see, e.g.*, ¶¶ 270, 483, 561, 643, 645. At this stage of the litigation, these allegations are sufficient for the Court to exercise subject matter jurisdiction over these claims.

Conversely, the Court finds that it lacks subject matter jurisdiction over the antitrust claims asserted against the International Defendants in Counts IX and X, and against SafranHE Canada in Count XI. In Counts IX and X, Plaintiff alleged only that SafranHE France had a practice of denying access to technical information to unauthorized service centers, *see id.* ¶¶ 425, 444, and that SafranHE France "approved the restraint in the . . . MAA[s]." *See id.* ¶¶ 426, 444. Plaintiff cannot, however, state a Sherman Act § 1 claim against SafranHE France premised on its approval of the contract alone, absent allegations that it was a party to the contract or a co-conspirator. *See Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1190, 1199-1200 (S.D. Tex. 2009). As for SafranHE Canada, the Complaint is silent about its involvement in these allegations; therefore, Plaintiff has not pleaded conduct that gives rise to a Sherman Act claim

against SafranHE Canada in these Counts. *See* 15 U.S.C. § 6a(1); *Hartford Fire Ins.*, 509 U.S. at 796 n.23..

Accordingly, the Court finds that it lacks subject matter jurisdiction over Counts IX and X insofar as they are pleaded against the International Defendants, and Count XI against SafranHE Canada.

### (2) *FTAIA and State Law Antitrust Claims*

The International Defendants assert that the FTAIA also bars the Kansas and California antitrust claims against them (Counts VI, XIV, XVIII, XXIV, and XXV), *see* Int'l Defs.' Br. 17-18, and Plaintiff does not respond to this argument. The Court, however, liberally construes Plaintiff's Response to encompass the International Defendants' challenge of this Court's subject matter jurisdiction over the state antitrust claims. First, the Court notes that it is without binding authority as to whether the FTAIA extends to state law claims. Some federal courts have concluded that it does. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 12-3802 SI, 2014 WL 1568870, at *4 (N.D. Cal. Apr. 18, 2014) (collecting cases, but refusing to reach the issue). The Court does not need to decide this question, however, because all of the state law claims allege that the International Defendants engaged in domestic conduct that caused domestic harm. *See* Third Am. Compl. ¶¶ 311, 326, 338, 341, 517-21, 523, 530, 532, 588, 592, 597, 710-12, 719-21. Accordingly, even if the Court found that the FTAIA extends to the Cartwright Act and the Kansas Restraint of Trade Act, a conclusion the Court specifically does not reach, the Court would find that it has subject matter jurisdiction over these claims.

### (3) *Personal Jurisdiction*

SafranHE France also moves to dismiss all claims brought against it, arguing that the Court lacks personal jurisdiction over it. The Court finds that it lacks personal jurisdiction over SafranHE

France as to Count II, but finds that it has specific or pendent personal jurisdiction over SafranHE France as to the other Counts.

### a. *General Jurisdiction*

As explained above, general jurisdiction allows a court to hear any claim against a nonresident defendant, and it exists when that defendant's "affiliations with [Texas] are so 'continuous and systematic' as to render them essentially at home in [Texas]." *Daimler AG*, 571 U.S. at 127 (quoting *Goodyear*, 564 U.S. at 919). "It is . . . incredibly difficult to establish general jurisdiction in a forum other than the place of incorporation or principal place of business." *Monkton*, 768 F.3d at 432 (citations omitted). Plaintiff does not contend in its response that the Court has general jurisdiction over SafranHE France. Nor could it, as the Complaint makes clear that SafranHE France is a French company. *See* Third Am. Compl. ¶ 7. Moreover, SafranHE France's main customer is headquartered in France, and nothing in the Complaint suggests that SafranHE France's principal place of business is anywhere in the United States. *See id.* ¶ 71. Accordingly, the Court finds that it lacks general jurisdiction over SafranHE France.

### b. *Specific Jurisdiction*

The specific jurisdiction analysis differs for federal antitrust claims and state law claims. For the federal antitrust claims, "jurisdiction over [SafranHE France] may be obtainable based on nationwide contacts rather than just Texas contacts," because Congress authorized nationwide service of process for these claims. *Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 718 (5th Cir. 1999) (citing 15 U.S.C. § 22). For state law claims, however, the focus is on SafranHE France's contacts with Texas, because "'the suit' must 'aris[e] out of or relat[e] to the defendant's contacts with the *forum*.'" *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (quoting *Daimler AG*, 571 U.S. at 127). Regardless,

Pendent personal jurisdiction "exists when a court possesses personal jurisdiction over a defendant for one claim, lacks an independent basis for personal jurisdiction over the defendant for another claim that arises out of the same nucleus of operative fact, and then, because it possesses personal jurisdiction over the first claim, asserts personal jurisdiction over the second claim."

*Nat'l Oil Well Varco, L.P. v. Sadagopan*, Civ. A. No. H-16-2261, 2017 WL 2957908, at *6 (S.D. Tex. July 11, 2017) (quoting *Rolls-Royce*, 576 F. Supp. 2d at 783). "The decision to exercise pendent personal jurisdiction is discretionary with the court." *Gen. Elec. Capital Corp. v. Mackzilla, LLC*, Civ. A. No. H-15-2425, 2016 WL 1059529, at *5 (S.D. Tex. Mar. 17, 2016) (citing *Rolls-Royce*, 576 F. Supp. 2d at 784). "Although the Fifth Circuit has not yet addressed pendent personal jurisdiction, this district and every circuit to decide the issue have approved the doctrine." *Id.* In this case, SafranHE France argues that Plaintiff did not plead sufficient minimum contacts for the Court to exercise jurisdiction over it, but does not argue that the exercise of personal jurisdiction would be otherwise unfair or unreasonable. *See* Int'l Defs.' Br. 18-21.

The Court finds that it has specific or pendent personal jurisdiction over SafranHE France as to Counts III, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, XIV, XXI, XXII, XXIII, XXIV, XXV, and XXVI. For each of these Counts, Plaintiff alleged that SafranHE France either contracted with, conspired with, or directed a Texas or domestic entity to engage in certain conduct—e.g., to adopt the Defacing and Accident Policies, to authorize the defacing of unserviceable parts, or to set prices, refuse services to a customer. *See, e.g.*, Third Am. Compl. ¶¶ 278, 350, 498-503, 558-62. The Court finds that these allegations suffice to show minimum contacts with the forum and a claim arising out of those contacts. *See Access Telecom*, 197 F.3d at 719 ("While [the defendant] did not conduct much business in Texas, it conducted a high volume of business with Texas and Texas corporations. It was this business with which [the defendant] was concerned when [it] allegedly canceled [the plaintiff's] numbers. Such actions, if done without a legal right, may amount to a violation of U.S. law."). Even if specific jurisdiction did not exist as to one or more

of these claims, the Court finds that these claims arise out of a common nucleus of operative facts and exercises pendent jurisdiction as to these claims.

On the other hand, the Court finds that Plaintiff did not plead sufficient facts for the Court to exercise specific or pendent personal jurisdiction over SafranHE France as to Count II, in which Plaintiff claims that SafranHE France converted Plaintiff's property. The Fifth Circuit addressed this precise issue in *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214 (2012). In *Pervasive*, the Fifth Circuit considered whether specific jurisdiction existed over a German corporation regarding a claim of conversion of property. *See id.* at 229. The Fifth Circuit noted that specific jurisdiction would exist if the German corporation committed the tort "in whole or in part" in Texas. *Id.* (quoting TEX. CIV. PRAC. & REM. CODE ANN § 17.042). Finding that the complaint alleged that the German corporation had offices only in Germany and did not allege that any act occurred in Texas, the Fifth Circuit concluded that the alleged conversion occurred in Germany and so did not fall under Texas's long-arm statute. *Id.* (citations omitted).

The Court finds the present case analogous. Plaintiff alleged that SafranHE France, a French company, converted and refused to return Plaintiff's property. *See* Third Am. Compl. ¶¶ 211, 218. There are no allegations showing that SafranHE France took any tortious action in Texas. Accordingly, the Court lacks specific jurisdiction over SafranHE France as to Count II. The Court further finds that the conversion allegations do not arise out of the same nucleus of operative fact as the other claims and so declines to exercise pendent personal jurisdiction over SafranHE France as to this Count. For these reasons, the Court grants the International Defendants' Motion as to Count II.

### (4) *Standing under the Cartwright Act*

SafranHE USA challenges Plaintiff's Cartwright Act claims, arguing that Plaintiff has not alleged that it was injured in California. *See* Br. 19-20. The Court construes this as a challenge to

Plaintiff's standing to bring these claims. The Cartwright Act "is California's version of the federal Sherman Act and sets forth California's antitrust laws." *Cellular Plus, Inc. v. Super. Ct.*, 14 Cal. App. 4th 1224, 1232 n.2 (1993). In order for a private plaintiff to have standing to sue under the Cartwright Act, the plaintiff must prove antitrust injury, "which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 1234 (citations omitted). Standing is broader under the Cartwright Act than under the Sherman Act, because the Cartwright Act allows even indirect purchasers to recover. *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1302 (S.D. Cal. 2009). Here, Plaintiff alleges that its injury implicates California because the various conspiracies involve Advanced, which appears to be a corporation located in California. *See* Third Am. Compl. ¶¶ 98, 338, 530, 597. The Complaint also suggests that Plaintiff was Advanced's customer. *See, e.g., id.* ¶¶ 283, 536. For the purposes of the pending motions, the Court finds that these allegations, viewed in the light most favorable to Plaintiff, are sufficient to confer standing upon Plaintiff as a customer of a California company. *See Lorenzo*, 603 F. Supp. 2d at 1302 (quoting *Cellular Plus*, 14 Cal. App. 4th at 1233)).

### C. *Failure to State a Claim*

Defendants further contend that the Complaint does not include sufficient facts to state twenty-six of the thirty causes of action alleged therein. Defendants do not challenge the sufficiency of the pleadings as to the alleged breach of contract involving Plaintiff's parts, wrongful detention, conversion, or negligence as to the parts, violation of the DTPA, and misrepresentation or concealment. For the following reasons, the Court grants the Motion as to every challenged claim except Count XV.[7]

---

[7] To the extent the Court already dismissed a claim in whole or in part, the following analysis constitutes additional grounds for dismissing that claim.

### (1)      *Antitrust Claims*

### a.      *Sherman Act § 1*

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . , or conspiracy in [unreasonable] restraint of trade or commerce." *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 848 (5th Cir. 2015) (alteration in original) (quoting 15 U.S.C. § 1). "[A] key distinction in antitrust law" is that certain restraints on trade are deemed per se illegal while others are analyzed under the rule of reason. *Id.* Thus, the Court will first determine whether the claims should be analyzed under the rule of reason or per se mode of analysis, and will then address the sufficiency of Plaintiff's allegations for these claims.

### i.      *Mode of Analysis*

Most arrangements challenged under § 1 are analyzed under the "rule of reason," which "requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 343 (1982). Experience has shown, however, that certain arrangements are generally found to be unlawful under the rule of reason, and so are presumed to unreasonably restrain competition. *Id.* at 344. These practices are referred to as per se violations and include certain types of "price fixing, division of markets, group boycotts and tying arrangements." *N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 360 (5th Cir. 2008) (quoting *Maricopa Cty.*, 457 U.S. at 344 n.15); *but see Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 887, 899 (2007) (holding that vertical price fixing is analyzed under rule of reason); *Meijer, Inc. v. Barr Pharm., Inc.*, 572 F. Supp. 2d 38, 48-49 (D.D.C. 2008) (collecting cases where exclusive supply agreements were analyzed under rule of reason). Courts generally do not expand the per se category absent demonstrable economic effect and a substantial history of declaring particular conduct unlawful. *See Abadir & Co. v. First Miss. Corp.*, 651 F.2d 422, 428 (5th Cir. Unit A July

1981) (first quoting *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 58-59 (1977); and then quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607 (1972)).

Counts V, VII, IX, X, XI, XII, XX, and XXI[8] appear to be premised on contracts or conspiracies between entities at different levels of the distribution chain. Such vertical restraints are analyzed under the rule of reason. *See, e.g., Sylvania*, 433 U.S. at 58 (holding that vertical restraints are generally analyzed under rule of reason); *Abadir & Co.*, 651 F.2d at 428 (refusing to extend per se category to "include all suppliers who also compete with their distributors"). Even if these Counts alleged contracts or conspiracies between competitors alone, these Counts do not allege price fixing, division of markets, group boycotts, or tying arrangements, and the Court will not unduly expand the per se category. Thus, the Court will analyze Counts V, VII, IX, X, XI, XII, XX, and XXI under the rule of reason.

This leaves Counts XIII and XVIII, which are labeled "price fixing" and "group boycott," respectively. *See* Third Am. Compl. 77, 90. Viewing the Complaint in the light most favorable to Plaintiff, the Court finds that Count XIII alleges a conspiracy to set prices among competitors. *See, e.g., id.* ¶ 497 ("SafranHE USA and Heli-One [agreed] not [to] undercut SafranHe [sic] USA's MRO services pricing . . . ."). Horizontal price fixing agreements are per se unlawful. *See N. Tex. Specialty*, 528 F.3d at 360. For the purpose of resolving the pending Motions, therefore, the Court will apply the per se mode of analysis to Count XIII.

With regard to the group boycott claim, "[t]he Supreme Court has regularly applied per se liability to agreements described as 'either directly denying or persuading or coercing suppliers or

---

[8] On its own review of the Complaint, the Court is of the opinion that Count XXI includes allegations that could be construed as giving rise to a tying claim under the Sherman Act. Although Plaintiff never raises this legal theory, "[t]o survive a 12(b)(6) motion to dismiss, a complaint need not correctly categorize the legal theories giving rise to the claims." *Rathborne v. Rathborne*, 683 F.2d 914, 917 n.8 (5th Cir. 1982); *see also Shippitsa Ltd. v. Slack*, Civ. A. No. 3:18-CV-1036-D, 2019 WL 3304890, at *12 (N.D. Tex. July 23, 2019) ("Even if [the] complaint fails to identify a specific legal theory, the court cannot dismiss it on that ground."). Accordingly, the Court addresses a potential tying claim and dismisses it for the reasons stated below. *See infra* § III.C.1.c.

customers to deny relationships the competitors need in the competitive struggle.'" *MM Steel*, 806

F.3d at 848 (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S.

284, 294 (1985)). Viewed in the light most favorable to Plaintiff, the Complaint appears to suggest

that Defendants and other authorized repair centers conspired not to sell parts to Plaintiff, a

competitor. *See* Third Am. Compl. ¶¶ 554, 564. Accordingly, the Court will analyze Count XVII

under the per se mode of analysis for the purpose of resolving the pending Motions.

### ii.    *Per Se Claims*

Although price fixing and group boycotts generally are found to be per se unlawful, it is

not enough for a plaintiff to summarily assert that a price fixing or group boycott conspiracy is

afoot. The Supreme Court analyzed the sufficiency of conspiracy allegations in *Bell Atlantic Corp.*

*v. Twombly*, and held that a complaint must state more than "an allegation of parallel conduct and

a bare assertion of conspiracy." 550 U.S. at 556; *see also Schafer v. State Farm Fire & Cas. Co.*,

507 F. Supp. 2d 587, 596-97 (E.D. La. 2007) (finding that the plaintiff did not adequately plead

the existence of a conspiracy).

The Court finds that Plaintiff did not plead sufficient facts to state a conspiracy either to

fix prices or to boycott Plaintiff. Count XIII, for example, alleges that Defendants conspired to fix

prices through a series of agreements with competitors. *See* Third Am. Compl. ¶¶ 495-514. The

Complaint does not mention, however, any agreement to which SafranHE Canada or SafranHE

France was a party. Even when the Complaint discusses a specific agreement, the Complaint states

no more than that SafranHE USA entered into agreements with its competitors "not to undercut

SafranHe [sic] USA's service pricing." *See id.* ¶¶ 497-502. This allegation simply rephrases the

claim—i.e., that SafranHE USA contracted with competitors to fix prices. Plaintiff did not allege

facts showing the purported conspiracy, such as allegations showing a decrease in price

competition, changes in pricing, or other facts establishing "more than a sheer possibility that

[Defendants] ha[ve] acted unlawfully." *Iqbal*, 556 U.S. at 678. Similarly, Count XVII describes in significant detail how Defendants and other companies keep track of the end user of their products, *see* Third Am. Compl. ¶¶ 555-60, and then summarily states that "SafranHE USA instructed Advanced . . . as well as the entire network of repair centers . . . not to do business with [Plaintiff]." *Id.* ¶ 561. These allegations, without more, are conclusory and do not raise Plaintiff's claim above the speculative level.[9] Accordingly, the Court grants the Motions as to Counts XIII and XVII.

### iii. *Rule of Reason Claims*

### (a) *Market Definition*

For the Court to declare a contract or conspiracy unlawful under the rule of reason, a plaintiff must allege that the contract or conspiracy restrains a particular market. *See MM Steel*, 806 F.3d at 843 (quoting *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220 (5th Cir. 2001)); *Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292, 295 (5th Cir. Unit A July 1981). To allege a relevant market, a plaintiff must allege a product market and a geographic market. *See PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 417 (5th Cir. 2010). A product market is defined by considering cross-elasticity of demand—i.e., two products are in the same market if an increase in the price of one product increases demand for another product. *See E.I. du Pont*, 351 U.S. at 404. Although the definition of the product market usually presents a question of fact, the Court may determine it as a matter of law:

> [w]here the plaintiff fails to define its proposed [product] market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable

---

[9] Even if Plaintiff had adequately pleaded that SafranHE USA entered into a conspiracy to fix prices or boycott Plaintiff, the Complaint is devoid of any facts showing SafranHE France's or SafranHE Canada's participation in the alleged conspiracies. This deficiency is fatal to Plaintiff's claims against SafranHE France and SafranHE Canada.

substitute products even when all factual inferences are granted in plaintiff's favor . . . .

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002).

The geographic market is based on the area of "effective competition . . . [which] must be charted by careful selection of the market area in which the seller operates and to which the buyers can practicably turn for supplies." *Id.* at 626 (citation omitted). Specifically, the geographic market includes all areas "not just where consumers currently purchase the product, but where consumers could turn for alternative products or sources of the product if a competitor raises prices." *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*, 309 F.3d 836, 840 (5th Cir. 2002). Here, the market definition is deficient in several ways.

Plaintiff alleges two product markets: a market for Defendants' engines and parts, and a market for MRO Services for Defendants' engines and parts. *See* Third Am. Compl. ¶¶ 252, 261. Even if the Court accepted that the product markets are limited to Defendants' products, Plaintiff provides no justification for defining the markets in reference to all of Defendants' customers *except* helicopter manufacturers. *See id.* ¶¶ 253, 262. Plaintiff argues that helicopter manufacturers are properly excluded because they "are not long-term owners of the engines and thus are not participants in the MRO [S]ervices or engine/parts markets." Resp. to SafranHE USA's Mot. to Dismiss (hereinafter, "Resp.") 13. The Court will not credit this implausible assertion and unwarranted factual inference. *See Ferrer*, 484 F.3d at 780. Nothing in the Complaint suggests that helicopter manufacturers cannot sell leftover engines or parts, or request or perform MRO Services on old parts in lieu of purchasing new parts. Even if helicopter manufacturers are properly excluded, Plaintiff's product market allegations do not include "manufacturers of new PMA Parts (substitute parts otherwise manufactured by companies not affiliated with [Defendants], under an FAA program known as Part Manufacturing

Authorization)." Third Am. Compl. ¶ 689. A substitute part is by definition interchangeable for the part it substitutes, meaning that the demand for substitute and original parts is typically cross-elastic. By the same token, the market definition presumably needed to include companies that service PMA parts. Finally, the Court finds that Plaintiff's allegations that the parts and services of other manufacturers are not interchangeable for Defendants' parts and services, *id.* ¶¶ 254-55, 263, are conclusory. *See Twombly*, 550 U.S. at 555.

Even if Plaintiff's product markets were properly defined, Plaintiff incomprehensibly limits the geographic market to the United States.[10] *See* Third Am. Compl. ¶ 245. Plaintiff's own allegations suggest that the geographic market is broader than this: the Complaint states that Defendants' customers and competitors are located in the United States and Canada. *Id.* ¶¶ 245-49. Additionally, there are numerous allegations that would suggest the relevant geographic market might be worldwide. For example, Plaintiff alleges that: (1) SafranHE France transacts business in the United States, *id.* ¶¶ 42, 45; (2) Defendants' principal customer Airbus allegedly has its headquarters in Marginane, France, *id.* ¶ 71; (3) SafranHE France "is the largest solely dedicated manufacturer of Helicopter Engines in the world," *id.* ¶¶ 76, 79; and (4) Defendants would ship parts for service across the Atlantic, *see id.* ¶¶ 64, 138. These allegations show that companies in this industry operate globally—i.e., a French company can profitably conduct business in the United States while maintaining a physical location abroad. The Complaint provides no reason for the Court to ignore Defendants' international competitors. *See Surgical Care*, 309 F.3d at 840 (considering whether consumer would turn to areas outside the United States for "alternative

---

[10] Plaintiff contends that this is a typo and that the sentence should have read "United States and Canada." *See* Resp. 12 & n.17. It is axiomatic that Plaintiff cannot amend the complaint by a brief in opposition to a motion to dismiss. *Energy Coal v. Citgo Petroleum Corp.*, 836 F.3d 457, 462 n.4 (5th Cir. 2016) (citing *Roebuck v. Dothan Sec., Inc.*, 515 F. App'x 275, 280 (5th Cir. 2013)). In any event, this correction would not save Plaintiff's defective market definition. Therefore, the Court will not grant Plaintiff leave to amend. *See* Resp. 12 n.17 (requesting leave to amend); *Legate v. Livingston*, 822 F.3d 207, 211 (5th Cir. 2016) ("[A] district court need not grant a futile motion to amend.").

products or sources of the product if a competitor raises prices"). In short, Plaintiff's "geographic market definition does not comport with the commercial realities of the industry" as described by Plaintiff. *See Honeywell Int'l Inc. v. MEK Chem. Corp.*, Civ. A. No. 3:17-cv-1390-M, 2018 WL 6737514, at *3 (N.D. Tex. July 5, 2018).

For the foregoing reasons, the Court finds that Plaintiff did not properly allege a relevant market and grants the Motions as to Counts V, VII, IX, X, XI, XII, XX, and XXI.

### (b) *Injury to Competition*

Even if Plaintiff adequately alleged a market for these Counts, the Court finds that Plaintiff's assertions regarding market injury are speculative. To state a claim under Sherman Act § 1, a plaintiff must allege *facts* showing an anticompetitive effect stemming from the unlawful conduct alleged. *See Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368, 375 (5th Cir. 2014) ("[Plaintiff's] Second Amended Complaint must allege facts showing that the [conduct] unreasonably restrained trade in the . . . market." (citations omitted)). "Speculation about anticompetitive effects is not enough." *Roy B. Taylor Sales, Inc. v. Hollymatic Corp*, 28 F.3d 1379, 1385 (5th Cir. 1994) (holding that plaintiff needed to show "that the tie 'as it actually operate[d] in the market' harmed competition," rather than the mere existence of a tie (quoting *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29 (1984))). Here, Plaintiff pleaded no facts showing an injury to competition for any of its Sherman Act § 1 claims. Plaintiff alleges, for example, that certain practices "suppress intrabrand competition," Third Am. Compl. ¶¶ 294, 466, 627, "harm[] competition, foreseeably, directly, and substantially," *id.* ¶¶ 298, 364, 432, 450, 488, 658, or raise prices. *See id.* ¶ 635. Plaintiff does not, however, provide any details about competition in the relevant markets. Accordingly, the Court finds Plaintiff's allegations of anticompetitive effect to be speculative and conclusory, and grants the Motions as to Counts V, VII, IX, X, XI, XII, XX, and XXI.

### b.    *Sherman Act § 2*

To state a claim for monopolization, a plaintiff must plausibly allege "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992). To state a claim for attempted monopolization, a plaintiff must plausibly allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power [in the relevant market]." *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 891 (5th Cir. 2016) (citation omitted). For both claims, Plaintiff must properly define a geographic and product market. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (noting that an attempted monopolization claim generally requires "a definition of the relevant market and examination of market power"); *Eastman Kodak*, 504 U.S. at 481 (noting that a plaintiff must allege "monopoly power in the relevant market" for a monopolization claim).

Plaintiff purports to have defined the market for its monopolization and attempted monopolization claims in its Sherman Act § 1 claims. *See* Third Am. Compl. ¶¶ 667, 698. As explained above, Plaintiff's market definition is deficient. Without a validly defined market, the Court cannot determine whether Defendants have market or monopoly power in those markets. *See Honeywell Int'l Inc.*, 2018 WL 6737514, at *3. Accordingly, the Court finds that Plaintiff did not sufficiently plead claims for monopolization and attempted monopolization, and grants the Motions as to Counts XXII and XXIII.

### c.    *Tying Claim*

A tying arrangement is "an agreement by a party to sell one product [(also called a tying product)] but only on the condition that the buyer also purchases a different (or tied) product, or at

36

least agrees that he will not purchase that product from any other supplier." *Schlotzsky's, Ltd. v. Sterling Purchasing & Nat'l Distrib. Co.*, 520 F.3d 393, 405 (5th Cir. 2008) (quoting *Eastman Kodak*, 504 U.S. at 461-62). The essential characteristic of an illegal tying arrangement "lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 34-35 (2006) (citation omitted).

While tying arrangements are often included in the list of per se violations of the Sherman Act, *see N. Tex. Specialty*, 528 F.3d at 360 (quoting *Maricopa Cty.*, 457 U.S. at 344 n.15), not all tying arrangements are per se unlawful. To state a claim for per se tying, a plaintiff must plausibly allege facts showing:

> (1) Two separate products (as opposed to components of a single product); (2) The two products are tied together or customers are coerced; (3) The supplier possesses substantial economic power over the tying product; (4) The tie has an anticompetitive effect on the tied market; and (5) The tie affects a not insubstantial volume of commerce.

*United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 235 n.2 (5th Cir. 1996) (citation omitted). Specifically, a plaintiff must plead "two, distinct markets," *Paramount Pictures Corp. v. Johnson Broad. Inc.*, 432 F. Supp. 2d 707, 709 (S.D. Tex. 2006) (citing *Jefferson Par.*, 466 U.S. at 21), properly "define the parameters of *each* of these markets," *id.* (emphasis added), and allege that the defendant has market power in the market for the tying product. *See Honeywell Int'l Inc.*, 2018 WL 6737514, at *6 (citations omitted). A tying arrangement that does not meet these requirements is analyzed under the rule of reason, which requires a plaintiff to show, among other things, an actual adverse effect on competition. *Id.* (citations omitted).

Here, Plaintiff does not affirmatively raise a tying claim but alleges in Count XXI that "SafranHE USA and SafranHE Canada . . . conditioned the sale of MRO Services on the purchase

of unnecessary 'modifications.'" Third Am. Compl. ¶ 645. As the Court should not dismiss a claim solely because Plaintiff did not identify a legal theory, *Rathborne*, 683 F.2d at 917 n.8, the Court must determine whether Plaintiff stated a plausible tying claim under either the per se or the rule of reason mode of analysis. First, the Court finds that Plaintiff did not state a per se tying claim, because the Complaint does not include a proper market definition, *see supra* § III.C.1.a.iii.a., let alone valid definitions of *two* distinct markets. *See Paramount Pictures*, 432 F. Supp. 2d at 709. And, in the absence of a validly defined market, the Court cannot determine that SafranHE USA or SafranHE Canada had market power in the sale of MRO Services. *See Honeywell Int'l Inc.*, 2018 WL 6737514, at *3, *6. Second, Plaintiff cannot recover for tying under the rule of reason, because the Complaint does not plead facts showing actual injury to competition. *Id.* at *6. As explained above, Plaintiff's allegations of injury to competition are speculative and conclusory. *See supra* § III.C.1.a.iii.b. Accordingly, the Court grants the Motions as to Count XXI insofar as it states a tying claim.

### d. *Cartwright Act and Kansas Restraint of Trade Act*

The same analysis conducted in conjunction with Plaintiff's Sherman Act claims governs Plaintiff's Cartwright Act and Kansas Restraint of Trade Act claims. *See Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (holding that the Cartwright Act was "modeled after the Sherman Act" and so the analysis "mirrors the analysis under federal law" (citations omitted)); KAN. STAT. ANN. § 50-163(b) ("[T]he Kansas restraint of trade act shall be construed in harmony with ruling judicial interpretations of federal antitrust law by the United States [S]upreme [C]ourt."). Accordingly, the Court grants the Motions as to Counts VI, XIV, XVIII, XXIV, and XXV for the reasons stated above.

### e.    *Statute of Limitations*

Even if the Court did not dismiss every antitrust claim for one or more of the deficiencies described above, the Court finds that Plaintiff did not assert Count IX and portions of Counts XI, XXII, XXIII, XXIV, and XXV, within the relevant limitations period.

"[A] complaint that shows relief to be barred by . . . the statute of limitations[] may be dismissed for failure to state a cause of action." *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982) (collecting cases). Federal antitrust claims that are not brought within four years of their accrual are "forever barred." 15 U.S.C. § 15b. "Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Rx.com v. MedcoHealth Sols., Inc.*, 322 F. App'x 394, 396 (5th Cir. 2009) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)). If a plaintiff alleges a continuing antitrust violation, suit may be brought within four years after the defendant "commits an overt act in furtherance of an antitrust conspiracy . . . or commits an act that by its very nature is a continuing antitrust violation." *Kaiser*, 677 F.2d at 1051. The key question is whether some injurious act actually occurred during the limitations period. *See Hibernia Nat'l Bank v. Indus. Alloys Co.*, No. 93-3035, 1993 WL 209995, at *2 (5th Cir. June 4, 1993); *Kaiser*, 677 F.2d at 1053 (citing *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir. 1975)). Thus, a plaintiff could allege a continuing antitrust violation by pleading that the defendant violated an antitrust duty to deal at a subsequent time during the limitations period, *see Rx.com*, 322 F. App'x at 396, but not by pleading that a contract was in existence at that time. *See Kaiser*, 677 F.2d at 1053. Importantly, even if a plaintiff alleges a continuing antitrust violation, the plaintiff can only recover for harm that occurred within the limitations period. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("But the commission of a

separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." (collecting cases)).

The analysis is similar for the state law antitrust claims. A claim brought under either California's Cartwright Act or the Kansas Restraint of Trade Act is not barred if the plaintiff alleges a continuous violation—a new, independent overt act that inflicts a new injury on the plaintiff. *See Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1071-72 (N.D. Cal. 2016); *Manildra Milling Corp. v. Ogilvie Mills, Inc.*, 723 F. Supp. 567, 570 (D. Kan. 1989). Like federal claims, a Cartwright Act claim is subject to a four-year statute of limitations. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2014 WL 2527221, at *3 (N.D. Cal. June 4, 2014) (citing CAL. BUS. & PROF. CODE §§ 16750.1, 17200). On the other hand, a Kansas Restraint of Trade Act is subject to a three-year statute of limitations. *See Four B Corp. v. Daicel Chem. Indus., Ltd.*, 253 F. Supp. 2d 1147, 1155-56 (D. Kan. 2003) (citing KAN. STAT. ANN. 60-512(2)). The two statutes also differ as to when the limitation period begins to run. While the limitations period under Kansas law begins to run when "the plaintiff knew or should have known of the harm," *In re Vitamins Antitrust Litig.*, No. MISC 99-197, 2000 WL 1524912, at *2 (D.D.C. July 14, 2000) (discussing *McCue v. Franklin*, 131 P.2d 704 (Kan. 1942)), a Cartwright Act claim accrues "when [it] is complete with all of its elements." *Garrison*, 159 F. Supp. 3d at 1065 (quoting *Pooshs v. Philip Morris USA, Inc.*, 51 Cal. 4th 788, 797 (2011)).

In this case, Plaintiff first alleged antitrust claims in its First Amended Complaint, filed March 28, 2016. *See* ECF No. 10. Consequently, any federal claim premised on injury that occurred solely before March 28, 2012, is barred, *see Kaiser*, 677 F.2d at 1051, any Cartwright Act claim that Plaintiff could have brought before March 28, 2012, is barred, *see Garrison*, 159 F. Supp. 3d at 1071-72, and any Kansas Restraint of Trade Act premised on injury that Plaintiff

should have discovered before March 28, 2013, is barred, *see Manildra Milling*, 723 F. Supp. at 570.

Viewing the Complaint in the light most favorable to Plaintiff, the Court finds that Plaintiff timely brought the following claims: (1) Counts V, VI, and VII premised on the alleged Defacing or Accident Policies that were enforced from 2013 to 2015 and harmed Plaintiff until 2014, *see* Third Am. Compl. ¶¶ 174, 190, 279, 281-82, 289-90, 353-55; (2) Count X that is premised on SafranHE USA's MAA with HSN signed in October 2012, *see id.* ¶ 442; (3) Counts XI and XII based on the Fleet Parts or Service Agreements, except the agreement with Heli-One signed in May 2009, *see id.* ¶ 462; (4) Counts XIII, XIV, XVII, and XVIII, purporting to state price-fixing and group-boycott claims based on conduct occurring in 2014 or 2015, *see id.* ¶¶ 498-502; (5) Counts XX and XXI that are based on exclusive supply agreements and other alleged MRO Services restraints adopted between 2013 and 2016, *see id.* ¶¶ 616, 623, 646-48; (6) Count XXII insofar as it alleges monopolization based on Defendants' agreements with Advanced or the Fleet Parts or Service Agreements, *see id.* ¶¶ 679, 681; and (7) Counts XXIII, XXIV, and XXV, to the extent they state claims not otherwise found untimely. These allegations suffice to show that the claims arose, Plaintiff was injured, or Defendants committed a continuous violation during the limitations period.

Conversely, the Court finds that the following claims are time-barred: (1) Count IX based on Plaintiff's MAA that was entered into on April 30, 2010, *see id.* ¶¶ 390, 421-39; (2) Count XI insofar as it purports to state a claim for Heli-One's agreement entered into in February 2010, *see id.* ¶ 497; (3) Count XXII to the extent it is premised on Defendants adopting policies of throwing away substitute parts and informing customers of this policy on February 9, 2003, *see id.* ¶¶ 689-90; and (4) Counts XXIII, XXIV, and XXV, to the extent they are based on Plaintiff's

MAA, SafranHE USA's February 2010 agreement with Heli-One, or Defendants' policy regarding substitute parts. Additionally, the Court finds that Counts XXIV and XXV are barred by the three-year statute of limitations applicable to Kansas Restraint of Trade claims, *see Four B. Corp.*, 253 F. Supp. 2d at 1155-56, to the extent they are based on SafranHE USA's MAA with HSN. *See* Third Am. Compl. ¶ 442. The Court further finds that Plaintiff did not allege any facts for these Counts showing that Defendants entered into, acted pursuant to, or harmed Plaintiff as a result of these contracts or policies during the limitations period. *See Kaiser*, 677 F.2d at 1051; *Garrison*, 159 F. Supp. 3d at 1071-72; *Manildra Milling*, 723 F. Supp. at 570. As such, the Court cannot conclude that these Counts describe a continuing antitrust violation. Accepting all of Plaintiff's well-pleaded allegations as true, the Court find that any antitrust injury arising out Plaintiff's MAA, Heli-One's agreement, Defendants' policy with regards to substitute parts, and SafranHE USA's MAA with HSN under the Kansas Restraint of Trade Act, occurred outside of the relevant limitations periods.

For the reasons stated above, the Court grants the Motions on limitations grounds as to Count IX, denies the Motions on this basis as to Counts V, VI, VII, XIII, XIV, XVII, XVIII, XX, and XXI, and grants in part and denies in part the Motions on this basis as to Counts XI, XXII, XXIII, XXIV, and XXV to the extent described in the preceding paragraph.

### (2) *Deceptive Practices Claims*

#### a. *Lanham Act*

A prima facie case of false advertising under [Lanham Act § 43(a)] requires the plaintiff to establish: (1) A false or misleading statement of fact about a product; (2) Such statement either deceived, or had the capacity to deceive a substantial segment of potential consumers; (3) The deception is material, in that it is likely to influence the consumer's purchasing decision; (4) The product is in interstate commerce; and (5) The plaintiff has been or is likely to be injured as a result of the statement at issue.

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000) (citations omitted).

"The failure to prove the existence of any element of the prima facie case is fatal to the plaintiff's claim." *Id.* (citation omitted). The first element of a § 43(a) claim requires a plaintiff to "demonstrate that the commercial advertisement or promotion is either literally false, or that [if the advertisement is not literally false,] it is likely to mislead and confuse consumers." *Id.* (alteration in original) (quoting *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1390 (5th Cir. 1996)).

Here, Plaintiff alleges that the following statements of SafranHE USA are false or misleading: (1) unauthorized service centers do not have access to Defendants' technical documentations, *see* Third Am. Compl. ¶¶ 733-35, 742, 744; (2) unauthorized repair centers are "issuing falsified release documents" when they repair Defendants' engines, *id.* ¶ 734; (3) Defendants may withhold instructions or other documentation as proprietary, *see id.* ¶ 736; and (4) repair centers that Defendants neither authorized nor did not authorize to provide repair service do so in violation of FAA regulations,[11] *see id.* ¶ 742. Plaintiff posits that these statements are "false and misleading because FAA regulations require [Defendants] to make available Technical Instructions . . . to all owners and maintenance providers." *Id.* ¶¶ 737, 745. The Lanham Act is not, however, an appropriate vehicle to enforce Plaintiff's interpretation of FAA regulations. *See Greater Hous. Transp. Co. v. Uber Techs., Inc.*, Civ. A. No. 4:14-0941, 2015 WL 1034254, at *10-11 (S.D. Tex. Mar. 10, 2015) (citing, among other things, *IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 373-74 (5th Cir. 2002)) (holding that the plaintiffs "failed to plead a cognizable

---

[11] The pertinent statement reads: "Turbomeca USA, Inc. specializes in the design, production, sale and support of low to medium power gas turbine engines for helicopters. . . . There are no other FAA authorized . . . Repair Centers within the United States qualified to provide all levels of repair and overhaul of the engine and fuel control unit other than Turbomeca USA, Inc.. [sic] Also, all manuals and technical documentation required to perform any repairs and/or overhauls on the Turbomeca engines are proprietary to Turbomeca USA, Inc. and are not available to non-authorized Repair Centers. Any other company providing repair service on this engine would be in violation of FAA regulations." Third Am. Compl. ¶ 742.

cause of action that [the defendant's] representations that they 'meet all local regulations' are false or misleading" because local regulations were subject to multiple interpretations). Thus, the fact that Plaintiff's Lanham Act claim seeks to enforce Plaintiff's preferred interpretation of FAA regulations is alone sufficient to warrant dismissal of Count XXVII.

The Court further finds that Plaintiff did not allege sufficient facts to show that any of SafranHE USA's statements were false or misleading. Plaintiff's only non-conclusory allegation showing that the statements were false or misleading is the FAA's November 10, 2016, letter to First Aviation Services, Inc., stating that "a design approval holder . . . may not deny access to [technical information] based on claims of proprietary data." Third Am. Compl. ¶ 737. Nothing in the Complaint explains how a 2016 FAA letter renders SafranHE USA's statements from 2009 to 2013 false or misleading. *See S. Snow Mfg. Co. v. Snow Wizard Holdings, Inc.*, 829 F. Supp. 2d 437, 453 (E.D. La. 2011) (finding that subsequent agency action did not render prior statements false). Accordingly, the Court grants Safran HE USA's Motion as to Count XXVII.

### b. *Common Law Unfair Competition*

"Unfair competition under Texas law 'is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.'" *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000) (quoting *Am. Heritage Life Ins. v. Heritage Life Ins.*, 494 F.2d 3, 14 (5th Cir. 1974)). Liability for unfair competition must be premised on some "independent substantive tort or other illegal conduct." *Schoellkopf v. Pledger*, 778 S.W.2d 897, 904-05 (Tex. App.—Dallas 1989, writ denied). Plaintiff's common law unfair competition claim is premised on the same allegedly false or misleading statements as its Lanham Act claim. *See* Third Am. Compl. ¶¶ 755-63; Resp. 24 (arguing that Plaintiff adequately pleaded a common law unfair competition claim because Plaintiff alleged a Lanham Act claim). As the Court grants SafranHE USA's Motion as to the

Lanham Act claim, the Court finds that Plaintiff's unfair competition claim is not premised on any independent substantive tort or other illegal conduct. *See Schoellkopf*, 778 S.W.2d at 904-05. Even if the unfair competition claim was premised on some tort, the Court finds that Plaintiff did not plead sufficient facts to show that SafranHE USA made any false or misleading statement for the reasons stated above. *See also Indus., Inc. v. Selander*, 932 F. Supp. 2d 754, 763 (N.D. Tex. 2013) (explaining that a common law unfair competition claim is analyzed under the same standard as a claim under the Lanham Act (quoting *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 236 n.7 (5th Cir. 2010))). Consequently, the Court grants SafranHE USA's Motion as to Count XXVIII.

### (3) *Breach of Contract*

SafranHE France moves to dismiss the portion of Count VIII that asserts that SafranHE France breached Plaintiff's MAA. "In Texas, '[t]he essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.'" *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (alteration in original) (quoting *Valero Mktg. & Supply Co. v. Kalama Int'l, L.L.C.*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.)).

In this case, the Complaint makes clear that SafranHE France was not a party to the contract between SafranHE USA and Plaintiff. *See* Third Am. Compl. ¶ 390 ("[Plaintiff] and SafranHE USA entered into the [MAA] . . . ."). Plaintiff does not dispute that SafranHE France was not a party to this agreement, but argues that due to SafranHE France's control over the technical instructions, an implied contract existed between the two. *See* Resp. to Int'l Defs.' Mot. to Dismiss 19-20. Even if the Court permitted this eleventh hour amendment of the Complaint, which it does not, *see Energy Coal*, 836 F.3d at 462 n.4, the Court would still grant the International Defendants'

Motion as to this claim. A claim for breach of an implied contract requires a plaintiff to "plead the existence of a valid implied contract," which, in turn, requires allegations showing "(1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Electrostim Med. Servs., Inc. v. Health Care Serv. Corp.*, 614 F. App'x 731, 744 (5th Cir. 2015) (quoting *Plotkin v. Joekel*, 304 S.W.3d 455, 476 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)). The Complaint includes no facts showing that SafranHE France offered, accepted, or consented to any terms of Plaintiff's MAA with SafranHE USA. Accordingly, the Court grants the International Defendants' Motion as to the portion of Count VIII asserted against SafranHE France.

### (4)     *Tort Claims*

#### a.     *Tortious Interference with Contract*

"The elements of a tortious interference with contract claim are: (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference; (3) such act was a proximate cause of damage; and (4) actual damage or loss occurred." *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 864 (5th Cir. 2004) (citation omitted). To prevail on a claim for tortious interference with an existing contract, a plaintiff must present evidence that the defendant induced a third party to breach the contract. *El Paso Healthcare Sys., Ltd. v. Murphy*, 518 S.W.3d 412, 421-22 (Tex. 2017). For the act of interference to be intentional or willful, "[t]he interfering party must know of the existence of a contract between the plaintiff and a third party." *Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 123 (Tex. App.—El Paso 1997, pet. denied).

The Court finds that Count III should be dismissed because Plaintiff did not allege sufficient facts to show that SafranHE France had knowledge of any contract subject to interference. Plaintiff merely stated, in conclusory fashion, that "SafranHE France had knowledge

of th[e] contracts," Third Am. Compl. ¶ 225, which is insufficient to state a claim for tortious interference. *See Hoffman v. L&M Arts*, 774 F. Supp. 2d 826, 846 (N.D. Tex. 2011). The only other allegation even remotely on point—that "a SafranHE France employee[] specifically mentioned [Plaintiff] in a presentation addressing both the Defacing Policy and the Accident Policy," Third Am. Compl. ¶ 225—does nothing to suggest that SafranHE France was aware of any specific contract. Accordingly, the Court grants the International Defendants' Motion as to Count III.

The Court denies, however, SafranHE USA's Motion as to Count XV. SafranHE USA argues that Count XV should be dismissed because Plaintiff did not plead that Defendants engaged in an independently tortious act. *See* Br. at 24-25. Plaintiff was not required, however, to plead an independently tortious act for this claim. *See El Paso*, 518 S.W.3d at 421 ("[I]nterference with an existing contract does not" require "a finding that the defendant engaged in independently tortious or unlawful conduct."). Accordingly, the Court denies SafranHE USA's Motion as to Count XV.

### b.    *Tortious Interference with Business Relationships*

The Complaint does not clearly state whether Plaintiff is alleging tortious interference with an existing or prospective business relationship. *See* Third Am. Compl. ¶¶ 541-51. To the extent Plaintiff is alleging tortious interference with an existing business relationship, "its elements are: '(1) unlawful actions undertaken by [the defendants] without a legal right or justifiable excuse; (2) with the intent to harm [the plaintiff]; and (3) resulting actual harm or damage.'" *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 214-15 (5th Cir. 2018) (alteration in original) (quoting *Am. Med. Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 335 (Tex. App.—Houston [14th Dist.] 1991, no writ)). To the extent Plaintiff alleges tortious interference with a prospective business relationship, its elements are:

1) a reasonable probability that the parties would have entered into a contractual relationship; 2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; 3) the defendant acted with a conscious desire to prevent the relationship from occurring, or it knew that the interference was certain or substantially certain to occur as a result of his conduct; and 4) the plaintiff suffered actual harm or damage as a result of the defendant's interference.

*Ewbank v. ChoicePoint Inc.*, 551 F. Supp. 2d 563, 566-67 (N.D. Tex. 2008) (citing *RAJ Partners, Ltd. v. Darco Constr. Corp.*, 217 S.W.3d 638, 649 n.10 (Tex. App.—Amarillo 2006, no pet.); *Richardson-Eagle, Inc. v. William. M. Mercer, Inc.*, 213 S.W.3d 469, 475 (Tex. App.—Houston [1st Dist.] 2006, rev. denied)).

Either way, Plaintiff must establish that Defendants committed an independently tortious or unlawful act. *See Ewbank*, 551 F. Supp. 2d at 566-67; *Adrain v. Genetec Inc.*, No. 2:08-CV-423, 2009 WL 3161386, at *3 (E.D. Tex. Sept. 30, 2009) (holding that unlawful act requirement of tortious interference with an existing business relationship claim is satisfied by showing that a defendant engaged in conduct that is "independently tortious or unlawful"). To be independently tortious or unlawful, the conduct must be more than "merely 'sharp' or unfair"—it must be "actionable under a recognized tort [theory]." *Centuria, Inc. v. Regiment Sec., LLC*, Civ. A. No. 3:11-CV-2500-N, 2013 WL 12250941, at *2 (N.D. Tex. Jan. 11, 2013) (alteration in original) (quoting *Ash v. Hack Branch Distrib. Co.*, 54 S.W.3d 401, 414-15 (Tex. App.—Waco 2001, pet. denied)).

In this case, Plaintiff alleges that Defendants' anticompetitive conduct satisfies the independently tortious act requirements of Counts IV, XVI, and XIX. *See* Third Am. Compl. ¶¶ 234, 236, 545; Resp. 25 (suggesting that the antitrust violations satisfy the independently wrongful action element). Alleged antitrust violations satisfy the independently tortious act requirement, regardless of whether the violations rise to the level of valid antitrust claims. *See In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 704-06 (Tex. 2015). Nevertheless, for the reasons

discussed above, the Court cannot conclude that Plaintiff has pleaded a plausible antitrust violation. The various antitrust violations are deficient because Plaintiff did not plead sufficient facts to allege a conspiracy, to define a relevant market, or to show injury to competition, or because the claim itself is untimely. *See supra* § III.C.1. Consequently, the Court finds that Plaintiff did not plead an independently tortious act and grants the Motions as to Counts IV, XVI, and XIX.

Furthermore, the Court notes that Count IV suffers from an incurable defect. Plaintiff alleges in this Count that the independently tortious act is SafranHE France's decision to have SafranHE USA and SafranHE Canada adopt the Defacing Policy. *See* Third Am. Compl. ¶¶ 234, 236. Plaintiff clarifies that this decision is independently tortious because it is an unlawful anticompetitive scheme. *See* Resp. to Int'l Defs.' Mot. to Dismiss 19. The Court finds that Plaintiff did not sufficiently plead that the Defacing Policy violates the antitrust laws. SafranHE France would not violate § 1 of the Sherman Act by "conspiring" with SafranHE USA or SafranHE France to adopt certain policies, because Defendants are in a parent-subsidiary relationship. *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771-72 (1984) (holding a parent and a wholly-owned subsidiary do not "conspire" for the purposes of Sherman Act § 1); *Century Oil Tool, Inc. v. Prod. Specialties, Inc.*, 737 F.2d 1316, 1317 (5th Cir. 1984) (holding two corporations owned by a single entity do not "conspire" for the purposes of Sherman Act § 1). Nor has Plaintiff adequately pleaded that SafranHE France's decision to adopt the Defacing Policy violates Sherman Act § 2. In the absence of a validly defined market, the Court cannot determine if SafranHE France possessed monopoly power in the relevant market—a necessary element of a § 2 claim. *See Eastman Kodak*, 504 U.S. at 481. As the analysis of the state antitrust claims would be the same, *see supra* § III.C.1.d., the Court finds that Plaintiff did not sufficiently plead that the

decision to adopt the Defacing Policy is independently tortious and grants the International Defendants' Motion as to Count IV for this additional reason.

### c. *Civil Conspiracy*

A civil conspiracy claim has the following elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." *Wackman v. Rubsamen*, 602 F.3d 391, 408 (5th Cir. 2010) (quoting *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005)). Defendants allege that Plaintiff's allegations regarding "a meeting of the minds" are conclusory. The Court agrees that Plaintiff's civil conspiracy claim should be dismissed.

The only remaining claims at this point are: Count I alleging that SafranHE USA and SafranHE Canada breached contracts; Count II alleging that SafranHE USA and SafranHE Canada are liable for wrongful detention, conversion, and negligence; Count VIII alleging that SafranHE USA breached Plaintiff's MAA; Count XV stating that SafranHE USA tortiously interfered with Plaintiff's contracts with Advanced; and Counts XXIX and XXX alleging that SafranHE USA is liable for misrepresentations or concealment under the DTPA or common law. The civil conspiracy claim does not, however, relate to any of these Counts. Rather, the conspiracy claim appears to be premised on the dismissed antitrust allegations. *See* Third Am. Compl. ¶ 727 ("The object to be accomplished by the conspiracy or conspiracies was to prevent competition . . . ."). As the Court grants the Motions as to the predicate claims, the Court also grants the Motions as to the civil conspiracy claim. *See Walker v. Beaumont Indep. Sch. Dist.*, Civ. A. No. 1:15-CV-379, 2016 WL 6666828, at *10 (E.D. Tex. Mar. 11, 2016) (dismissing conspiracy claim after dismissing predicate claim). Accordingly, the Court grants the Motions as to Count XXVI.

## D.    *Dismissal with Prejudice*

The Court has discretion whether to dismiss a claim with or without prejudice. *See Club Retro L.L.C. v. Hilton*, 568 F.3d 181, 215 n.34 (5th Cir. 2009). "[A]t some point, a court must decide that a plaintiff has had fair opportunity to make his case; if, after that time, a cause of action has not been established, the court should finally dismiss the suit." *Schiller v. Physicians Res. Grp., Inc.*, 342 F.3d 563, 567 (5th Cir. 2003) (quoting *Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986)). "[P]leadings review is not a game where the plaintiff is permitted to file serial amendments until he finally gets it right." *United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 404 (5th Cir. 2004); *see also United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 387 (5th Cir. 2003) (holding that leave to amend was properly denied where the plaintiff had two prior opportunities to amend the complaint and the district court had once before granted leave to cure the complaint's lack of specificity). This is especially true where a plaintiff "did not suggest in [his or her] responsive pleading any additional facts not initially pled that could, if necessary, cure the pleading defects raised by the defendants." *Goldstein v. MCI WorldCom*, 340 F.3d 238, 255 (5th Cir. 2003). Additionally, a district court may deny the plaintiff an opportunity to replead if an amendment of a claim is futile. *See Legate*, 822 F.3d at 211 (citing *Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 872 (5th Cir. 2000)).

Plaintiff did not move for leave to amend the Complaint. In fact, Plaintiff only requested to amend the definition of the geographic market, and the Court found this proposed amendment to be futile. *See supra* note 10. Moreover, Plaintiff had the benefit of an entire arbitration proceeding, *see* ECF No. 44, four prior motions to dismiss, ECF Nos. 25, 31, 54, 55, and oral argument before this Court, *see* ECF No. 91. In fact, the Court previously dismissed the Second Amended Complaint due to numerous pleading deficiencies, *see* ECF No. 92 at 61:20-24, and many of these deficiencies stayed the same after Plaintiff's third amendment. *See* ECF

Nos. 54, 55. Despite being afforded significant opportunities to state its case, Plaintiff used these opportunities to expand the number of its claims while failing to substantiate with facts existing claims. The Court will not condone Plaintiff's scattershot pleading tactics. The Fifth Circuit has held that a court may, in its sound discretion, deny leave to amend on substantially similar facts. *See Humana Health Plan*, 336 F.3d at 387. Accordingly, in its discretion, the Court finds that Plaintiff "has had fair opportunity to make [its] case," *Schiller*, 342 F.3d at 567, and grants the Motions as to Counts II and VIII against SafranHE France with prejudice and Counts III, IV, V, VI, VII, IX, X, XI, XII, XIII, XIV, XVI, XVII, XVIII, XIX, XX, XXI, XXII, XXIII, XXIV, XXV, XXVI, XVII, and XXVIII against all Defendants in their entirety with prejudice. The Court additionally finds that amendment of Counts III, IV, V, VI, VII, VIII, IX, X, XI, XII, XX, XXI, XXII, XXIII, XXIV, XXV, XVI, XXVII, and XXVIII would be futile.

## IV.    CONCLUSION

For the reasons discussed above, the Court grants in part and denies in part the Motions. The Court grants the Motions as to Counts II and VIII against SafranHE France with prejudice and Counts III, IV, V, VI, VII, IX, X, XI, XII, XIII, XIV, XVI, XVII, XVIII, XIX, XX, XXI, XXII, XXIII, XXIV, XXV, XXVI, XVII, and XXVIII against all Defendants in their entirety with prejudice. The Court denies SafranHE USA's Motion as to Count XV.

**SO ORDERED.**

SIGNED August 1, 2019.

**KAREN GREN SCHOLER**
**UNITED STATES DISTRICT JUDGE**